```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION
```

UNITED STATES OF AMERICA,       )
                                )
               Plaintiff,       )
                                )
     v.                         )     No.  09 C 4155
                                )         (06 CR 359-1)
DAVID GROSKY,                   )
                                )
               Defendant.       )

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

On July 10, 2009 David Grosky ("Grosky") filed a 28 U.S.C. §2255 ("Section 2255") motion, seeking to vacate his conviction and sentence following his guilty plea to a massive financial fraud that victimized thousands of investors who had purchased stock in Efoora, Inc. ("Efoora"). Grosky, a nonpracticing lawyer who had been Efoora's Chief Executive Officer and Chairman of its Board of Directors during the entire period covered by the multicount indictment, claimed in his Section 2255 motion that he was a "victim" too--in this instance, by suffering constitutionally inadequate representation on the part of his experienced criminal counsel.

This Court promptly issued a July 14 memorandum opinion and order that "grant[ed] Grosky's contemporaneous motion for leave to file a supporting memorandum as to all issues except Ground One on or before September 14, 2009," as well as "order[ing] the United States Attorney's Office to file a response to all aspects of the Motion on or before the same date." On September 14 the

United States timely complied with that directive by filing its Government's Response to Petitioner's Motion To Vacate, Set Aside or Correct Sentence--but nothing was forthcoming from Grosky. This Court waited three days beyond the specified due date and, still having received nothing from Grosky, then issued its September 18 memorandum opinion and order ("Opinion") denying (and explaining the reasons for denying) the Section 2255 motions that had been filed both by Grosky and by one of his codefendants.

Later on the very same September 18 date that the Opinion had been issued, the Clerk's Office delivered to this Court's chambers Grosky's belated filing of a Motion for Leave To File Reply Brief, coupled with a 25-page Legal Memorandum in Support of Petition for Relief Pursuant to 28 U.S.C. §2255 (that dual filing by Grosky had been received in the Clerk's Office on the preceding day (September 17), but the normal procedures in that office--first docketing, then sorting all incoming filings for distribution to the various judicial chambers--typically provide next-day delivery). This Court has reviewed Grosky's submission with care, and it holds that no change is called for in the conclusion reflected by the Opinion.

Some review of the bidding is called for. Grosky entered into his plea agreement and pleaded guilty <u>more than two years ago</u>, on August 27, 2007. This current filing is not Grosky's

initial effort at second-guessing--on April 22 <u>of this year</u> he filed a self-prepared Motion for Specific Performance of his 2008 plea agreement. That motion turned out to be based on Grosky's mistaken belief that the government was claiming that the residence that had been conveyed to Grosky's former wife in their dissolution of marriage proceeding was sought to be made the subject of a forfeiture proceeding--it was not.

But what is most significant is not that mistake on Grosky's part, but rather the following express acknowledgment that he made just five months ago in that motion, in his own words, at a time when he was fully aware of all of the things that he <u>now</u> claims evidence constitutional inadequacies on the part of his lawyer:

> That prior to the execution of the DEFENDANT's plea agreement, the Government and the DEFENDANT negotiated the terms of the agreement for an approximate 3 month period. Several drafts and re-drafts were exchanged, each time with the DEFENDANT requesting deletions of certain factual allegations which he would not agree to as being factually truthful.

Nor only does that confirm Grosky's active and direct involvement in the negotiation and preparation of the plea agreement, but it squarely undercuts his present effort to discredit his counsel for assertedly having saddled him with the effects of constitutionally deficient lawyering.

It will be recalled that although he acted as a businessman in the Ponzi scheme that he perpetrated with respect to the

3

Efoora investors, Grosky had been trained as a lawyer. Opinion at 3-4 has set out in brief compass the summary of a portion of the extended colloquy that took place at the time that this Court accepted Grosky's guilty plea, with Grosky at that time making express representations and acknowledgments from which he now tries to distance himself. But he has conveniently forgotten his self-prepared effort to enforce the plea agreement in April 2009, only a few months back, when he was unquestionably fully aware of the matters that he now claims constituted constitutionally inadequate representation.

Moreover, Grosky's sentencing proceeding took place on July 14, 2008, just four days short of a year before his Section 2255 filing. Yet Grosky voiced no objection during that intervening year either, let alone seeking to retract his negotiated plea. Although this Court would not presume to "play doctor" in addressing the complex issues of mental health and personal motivations on Grosky's part, one of his current assertions refers to his extensive therapy dealing with such matters--and the United States Probation Office's June 26, 2008 Supplemental Report (received less than a month before Grosky's sentencing) reflects some of Grosky's difficulties in that respect, which appear to have carried forward into his present tendency to provide a revisionist recharacterization of the facts.

Thus Grosky's new submission acknowledges that "the Government's <u>advisory</u> sentencing calculation of over 200 months was, in fact, reasonable" and that "the Court's imposition of a 168 month sentence was reasonable based upon my guilty plea." Yet he continues to point to counsel's asserted delinquency in "fail[ing] to advise me to <u>not</u> agree to a sentence of 144 months in Federal Prison [as] objectively unreasonable"--a position that refuses to live up to the reality that no such reduced sentence was within the government's contemplation or offered to Grosky.

And Grosky's other attempts to muddy up his counsel's work fare no better--for example, he complains extensively about counsel's failure to call as witnesses investors who had not complained of Grosky's conduct. Quite apart from Grosky's reference to that as a "strategic decision" by counsel (normally the antithesis of constitutionally inadequate representation under the <u>Strickland v. Washington</u> formulation), the Government's Mem. 11-12 demonstrates the potential risk from calling such witnesses and the absence of any arguable prejudice to Grosky. And look at the detailed <u>Factual Basis</u> that Grosky expressly <u>admitted</u> in his plea agreement (pages 2 through 6 of which are attached as Ex. A)--things that would not have been shaken by the testimony of individual investors designated by Grosky and his

5

counsel.[1]  That would have made no difference in the sentence imposed by this Court.

In sum, this Court's view continues to be that Grosky "is suffering the criminal equivalent of buyer's remorse" (Opinion at 2).  Its earlier denial of Grosky's Section 2255 motion remains intact.

                                                    /s/ Milton I. Shadur
                                      _____
                                        Milton I. Shadur
                                        Senior United States District Judge

Date:  September 22, 2009

---

[1] It is worth observing parenthetically that the very nature of a Ponzi scheme involves the schemers robbing Peter to pay Paul (or given the original nature of Charles Ponzi's activities, robbing Pietro to pay Paolo) to create the image of a successful operation and thus lure new investors.  So the presence of satisfied (even happy) investors who have received the projected or promised yield is to be expected.

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Counts One and Two of the indictment. Counts One and Two charge the defendant with devising and participating in a scheme to defraud investors and to obtain money and property by means of material false and fraudulent pretenses and misrepresentations in violation of 18 U.S.C. §§ 1341 and 1343, respectively.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Two of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

**Background:** With respect to Counts One and Two of the indictment, defendant DAVID GROSKY ("Grosky") admits that from approximately June 1997 through approximately August 2004, he was the Chief Executive Officer of Efoora, Inc., and that from approximately June 1997 through approximately June 2005, he was the Chairman of the Board of Directors of Efoora, a company located in Buffalo Grove, Illinois, which purported to be in the business of designing, manufacturing and marketing rapid diagnostic tests. Efoora had two subsidiary companies: Virotek, LLC, which was the manufacturing division, and Prion Developmental Laboratories, which engaged in research and development (hereinafter collectively referred to as "Efoora").

Between in or about 1997 through in or about early 1999, Efoora had raised less than $1 million, and had less than 200 investors. In or about 1999, the company began to increase its sale of stock, and Efoora began to increase its use of individuals and entities who located and sold stock to investors (hereinafter referred to as "finders"). In or about 2000 Efoora issued its first Private

2

Placement Memo ("PPM") to sell stock. In or about 1999 and 2000, the number of investors began to increase and the amount of stock that was sold increased. Between in or about 2000 and 2004, Efoora had 7 stock offerings. Grosky sold Efoora stock, and caused others to sell Efoora stock, from in or about at least early 1999 through in or about May 2006. Grosky frequently spoke to investors who were seeking information and updates concerning Efoora and the stock, and Grosky helped close the sale of stock to many investors. In or about 2002, Grosky received approximately 5 million shares from Efoora for his interest in Virotek, and in or about 2004, Grosky received approximately than 12 million shares from Efoora. He also received a salary totaling approximately $1 million.

**The Scheme:** Beginning no later than in or about the summer of 1999, and continuing until at least in or about March 2006, at Buffalo Grove, Illinois, and elsewhere, Grosky, together with Craig Rappin ("Rappin"), Melvin Dokich ("Dokich") and others, devised and intended to devise, and participated in, a scheme to defraud and to obtain money and property from prospective investors and actual investors (hereinafter referred to collectively as "investors") by means of materially false and fraudulent pretenses, representations and promises, and by means of material omissions. Between in or about early 1999 and May 2006, Efoora issued and sold over 100 million shares of its stock, raising over $35 million from investors. There are approximately 5000 shareholders of Efoora; approximately 3000 of those investors purchased stock through Efoora, and approximately 2000 of those investors purchased stock through sources outside of Efoora.

### False Statements

From in or about at least early 1999 through May 2006, Grosky made, and caused others to make, materially false statements to investors and finders in order to convince individuals to invest and in order to help Efoora keep funds already invested. Grosky knew that those statements were false at the time that the statements were made. Those false statements were made orally and in various written materials distributed to investors and finders that included PPMs, business plans, financial statements, projected financials, newsletters, executive summaries, documents on Efoora's website, and correspondence. Grosky distributed and caused others to distribute Efoora's written materials to investors and finders. Grosky admits that the material false statements and omissions, which he made and caused others to make to investors and finders, included the following:

**Finders' Fees:** Beginning in or about 2000 and continuing through in or about at least December 2003, Grosky falsely represented, and caused others to falsely represent, that Efoora paid commissions and fees to finders of no more than 12% of the sale price of the stock. In fact, Grosky consistently caused Efoora to pay commissions of 30% to 45% of the sale price. Grosky intentionally caused Efoora's PPMs to misrepresent the amount of the commissions and fees because it was Grosky's understanding that the Securities and Exchange Commission ("SEC") would not allow Efoora to continue selling stock to investors while paying commissions that were ordinarily between 30% and 40% of the sale price. Grosky attempted to conceal the fact that Efoora was paying such high commissions by agreeing with finders to falsely call the commissions consulting fees, and by sending the finders contracts that falsely identified the commissions as consulting fees.

**Accredited Investors:** Beginning in or about 2000 and continuing through in or about May 2006, Grosky falsely represented, and caused others to falsely represent, that stock was offered by Efoora only to accredited investors, who met certain financial requirements. In fact, while Grosky worked at Efoora, Grosky believed that about 30% of Efoora's investors did not qualify as accredited investors. Grosky knew that Dokich and various finders were selling Efoora stock to individuals who did not meet the accreditation requirements.

**Stock Prices:** Beginning in or about 2000 and continuing through in or about at least December 2003, Grosky knew that Efoora's PPMs falsely represented that a specified number of Efoora shares would be sold at a particular price. In fact, Grosky continued to sell, and authorized others, including Dokich, to sell, Efoora shares at varying prices, regardless of what the PPMs said. Grosky knew that stock was seldom sold at a consistent price within a given PPM.

**SEC Exemption:** Beginning in or about 2000 and continuing through in or about at least December 2003, Grosky knew that Efoora's PPMs falsely represented that Efoora was exempt from the SEC registration and reporting requirements. It was Grosky's understanding that Efoora was not exempt because of the large number of unaccredited investors that Efoora had. Moreover, it was Grosky's understanding that in order to be exempt, a company had to have a six-month waiting period between offerings, during which time the company could not sell any stock. Grosky knew that Efoora did not stop selling stock between offerings.

**FDA Approval of the HIV Test:** Beginning in at least early 2004 and continuing through in or about May 2006, Grosky knowingly made, and caused others to make, materially false representations that Efoora was going to receive FDA approval of Efoora's rapid HIV test within a year or less. In fact, Grosky knew that the FDA had issued warning letters to Efoora concerning the HIV test, and that Efoora did not have the funds to take the actions that needed to be taken in order to obtain FDA approval.

**FDA Approval of the Glucose Test:** Beginning in at least 2002 and continuing through in or about May 2006, Grosky falsely represented, and caused others to falsely represent, that the FDA was going to approve the Efoora glucose test within a year or less, when, in fact, Grosky knew that the company did not have the money to do the clinical trials and pay for the actions required to get FDA approval. Grosky also falsely represented, and caused others to falsely represent, that Efoora could at that time produce the glucose strip at an extremely low price, when in fact Grosky did not know whether or not Efoora would be able to produce the glucose strip at an extremely low price because, as Grosky knew, Efoora had not completed developing the technology that would allow mass production of that product at the specified low price.

**Going Public:** At various times between 1999 and December 2003, Grosky knowingly made, and caused others to make, materially false representations that Efoora was going to become a publicly traded company within a year or less. In fact, Grosky knew that Efoora was not going to go public within the specified time period because Efoora did not have a company that was willing to take Efoora public. It was Grosky's understanding that before a company would be willing to take

4

Efoora public, Efoora needed to generate substantial revenue and obtain FDA approval for certain products, in order to demonstrate that Efoora would be successful after going public.

**Contracts and Revenue:** Beginning in at least 2000 and continuing through in or about May 2006, Grosky knowingly made, and caused others to make, materially false representations that Efoora had contracts that were about to generate substantial revenue. During approximately 2000 and 2001, Grosky falsely represented that manufacturing contracts with two major pharmaceutical companies were going to generate substantial revenue for Efoora. Between 2001 and 2003, Grosky made false statements concerning numerous contracts or sales revenue opportunities, which created the false appearance that these were completed deals, or almost completed deals. Between approximately 2004 and 2005, Grosky falsely represented, and caused others to falsely represent, that there were large contracts and orders from the Congo, and that Efoora would have significant revenue from those orders, even though Grosky knew that Efoora did not have any orders from the Congo. Between approximately 2000 and 2005, Efoora issued projections concerning revenues and Grosky knew that those projections needed to be updated as time passed because the projections did not accurately reflect the company's actual performance, but Grosky did not cause any changes to made to those projections.

**Quiet Period:** In or about 2001 and 2002, Grosky and Dokich caused monies from the sale of Efoora's treasury stock to be deposited into Dokich's personal account, and then paid to Efoora, in order to make it falsely appear that Efoora was in a quiet period, and Efoora was not selling stock.

**Leader:** Grosky acknowledges that he directed the fraudulent activities of Dokich, and that there were at least three other finders who made false statements to investors, provided written materials which they knew contained false statements, and knowingly engaged in other fraudulent conduct in order to mislead investors.

**Fiduciary duty:** Grosky acknowledges that as a member of the Board of Directors and an officer of the company, he owed a fiduciary duty to Efoora and Efoora's investors.

**As to Count One (Mailing):** On or about August 12, 2003, in the Northern District of Illinois, Grosky, for the purpose of executing the above-described scheme, and attempting to do so, did knowingly cause to be delivered by mail, according to the directions thereon, an envelope, containing a check from investor CH in California, made payable to Efoora, Inc, in the amount of approximately $15,000, to purchase stock in Efoora, which envelope was addressed to Efoora, in Buffalo Grove, Illinois, in violation of Title 18, United States Code, Sections 1341 and 2.

**As to Count Two (Wire):** On or about August 12, 2003, in the Northern District of Illinois, Grosky, for the purpose of executing the above-described scheme, and attempting to do so, did knowingly cause to be transmitted in interstate commerce from a bank in Buffalo Grove, Illinois, to a correspondent bank in Wisconsin, by means of wire and radio communications, certain writings, signs, and signals, through a phone line, namely: instructions directing the Wisconsin bank to wire transfer approximately $152,228 to a Florida company's bank account in Florida, which funds

belonged to Efoora and were being sent to a broker in Florida to pay commissions - of approximately 45% - relating to the Florida company's sale of Efoora stock, in violation of Title 18, United States Code, Sections 1343 and 2.

7. The foregoing facts are set forth solely to assist the court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crime and related conduct.

## Maximum Statutory Penalties

8. Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

    a. Count One carries a maximum sentence of 20 years' imprisonment, and a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count One the judge also may impose a term of supervised release of not more than three years.

    b. Count Two carries a maximum sentence of 20 years' imprisonment and a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands that with respect to Count Two, the judge also may impose a term of supervised release of not more than three years.

    c. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.